## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| BEKAERT CORP., | ) | CASE NO. 5:09CV2903 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| vs. | ) | |
| | ) | |
| STANDARD SECURITY LIFE | ) | **MEMORANDUM OPINION** |
| INSURANCE CO. OF NEW YORK, | ) | **& ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Bekaert Corporation ("Bekaert") filed a complaint against defendant Standard Security Life Insurance Company of New York ("Standard") in the Summit County Court of Common Pleas on November 5, 2009, alleging breach of contract and seeking declaratory relief with respect to the Standard's denial of a medical benefits claim under a "stop loss" insurance policy issued to Bekaert. Defendant removed the action to this Court on December 15, 2009, invoking diversity jurisdiction. (Doc. 1.) On May 18, 2010, Bekaert filed an amended and supplemental complaint (Doc. 21), asserting the wrongful denial of three additional insurance claims. This matter is now before the Court on cross-motions for summary judgment by Bekaert and Standard. (Docs. 45 & 60.) The matter is fully briefed and is ripe for this Court's disposition. For the reasons set forth below, plaintiff's motion for summary judgment is **DENIED**, and defendant's motion for summary judgment is **GRANTED**.

## I.    BACKGROUND

Plaintiff Bekaert is an Ohio corporation that provides health care benefits to its employees through the self-funded Bekaert Corporation Employee Health Benefit Plan (the "Plan"). Bekaert hired Klais & Company, Inc. ("Klais") as a third party administrator to oversee

its health insurance claims. Bekaert, through Klais, contracted with Standard through Standard's underwriting services company, TRU Services, LLC ("TRU"), for a medical stop-loss insurance policy (the "Policy"). The initial term of the parties' agreement was for the period of January 1, 2008 through December 31, 2008, which was renewed through December 31, 2009.

The Policy indicates that the parties' agreement consists of the Policy, Bekaert's Application for coverage, a Disclosure Statement by Bekaert indicating known, large claims that potentially exceeded the policy deductible, and a copy of the Plan. (Doc. 21-1, at 1.) The Application for insurance provides that any coverage resulting from the application "shall be as described in and shall be subject to the terms and provisions of the Policy." (Doc. 54-2, at 3.) The Disclosure Statement indicates that it is an "integral part of the application for excess loss coverage," and that Standard and TRU "use the information requested…] solely for the purpose of evaluating the acceptability of this risk […]." (Doc. 54-4, at 2.) Pursuant to its Application, Bekaert agreed that its "statements and declarations made in this Application, the Disclosure Statement, and in the Plan […] are true and complete and that the Policy, when issued, will be issued in reliance upon the truth and completeness of such statements and declarations." (Doc. 54-2, at 3.)

Under the Policy, Standard pays for "eligible expenses" of "covered persons" that exceed a one-time Self-Funded Liability of $111,500 and a $200,000 per person deductible up to a maximum of $2 million per person. The Policy defines covered persons as "individuals eligible for coverage, and covered under the Plan" and eligible expenses as "the reasonable and customary charges covered by the Plan and incurred during the benefit period by a covered person." (Doc. 21-1, at 6.) According to the Policy, Bekaert is "solely responsible for the investigating, auditing, calculating, adjudication and paying of all claims under the Plan […]."

(*Id*. at 10.) The Policy indicates, however, that reimbursement by Standard is "subject to all terms, conditions, limitations and exclusions in the Policy and the Plan." (*Id*. at 8.) The Policy excludes coverage for "expenses for any COBRA continuee or retiree whose continuation of coverage was not offered in a timely manner or according to COBRA regulations." (*Id*.) This exclusion controls over any "more liberal exclusions and limitations provisions" in the Plan. (*Id*.) Further, the Policy provides that if there is a conflict between the terms of the Plan and the Policy, "the terms and provisions of this Policy will govern." (*Id*.) Finally, the Policy provides that, "clerical error will not invalidate insurance otherwise in effect, but that clerical errors do not include "the failure to comply with the Plan or this Policy." (*Id*.)

The Plan that Bekaert submitted and Standard accepted provides that certain of Bekaert's active full-time employees and retirees are eligible for benefits. (Doc. 48-2, at 10-26.) The Plan provides that Bekaert, as the plan administrator, "has the exclusive right to interpret the Plan and decide all matters arising under the Plan," including making final and binding eligibility and benefit determinations. (*Id*. at 6-7, 9.) Upon a termination of coverage, the Plan provides for the continuation of benefits under various circumstances. (*Id*. at 38-44.) The Plan states that it "intends to comply with the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") […] which requires that the Plan offer persons covered by the Plan the right to continue coverage following certain qualifying events as described below." (*Id*. at 42, § 6.11.1.) It then indicates that such "qualifying events" include, but are not limited to, an "employee's termination of employment (except for gross misconduct) or loss of eligibility due to reduced hours."[1] (*Id*., § 6.11.2.) The maximum length of continuation coverage following a termination

---

[1] Section 6.11.2 of the Plan provides as follows:

Qualifying events:

of employment or reduction in hours under the Plan is 18 months, and after any other qualifying event is 36 months. (*Id.* at 43, § 6.11.6.) The Policy provides that amendments to the Plan are not covered under the Policy "unless [Standard] [has] accepted the proposed change in writing." (Doc. 21-1, at 11.)

Jerry Padgett was a salaried employee at Bekaert's Rome, Georgia facility from 1970 until April 1, 1999, when he retired pursuant to a Voluntary Separation Agreement ("Separation Agreement"). (Doc. 60-10.) Under the terms of the Separation Agreement, Mr. Padgett was entitled to participate in the Bekaert Rome Enhanced Retirement Program for Salaried Employees, which provided two options for continuation of health benefits coverage under the Plan. The first, known as "Option C," entitled participants to receive limited retiree benefits offered under the Plan up to a lifetime maximum of $100,000 at no cost. The second, known as "Option D," entitled participants to continue receiving the health benefits available to active employees under the Plan with no lifetime maximum at no cost for one year, and thereafter, provided the participant paid the required monthly premiums for coverage until the participant reached the age of 65 or was covered by Medicare or another health plan. (Doc. 48-1, at 2-3.) Bekaert referred to Option D coverage as "extended COBRA medical health benefits." (*Id.* at 1.) Mr. Padgett elected coverage under Option D and continued paying the required premiums through 2009. (*Id.*)

On February 18, 2009, Mr. Padgett underwent heart bypass surgery. He died on May 6, 2009. During that period, Mr. Padgett incurred medical costs totaling $474,455.16.

---

(a) Employee's termination of employment (except gross misconduct) or loss of eligibility due to reduced hours.
(b) Employee's death.
(c) Divorce or legal separation of spouse from employee.
(d) Dependent child no longer eligible under the Plan.
(e) Dependent coverage to cease due to employee's entitlement to Medicare.

Bekaert determined that Mr. Padgett was covered under the Plan as a COBRA participant, and Klais paid his medical costs on behalf of Bekaert. Klais then submitted the claim to Standard under the stop-loss Policy.

By way of letter dated July 23, 2009, Standard, acting through TRU, denied the Padgett claim for the reasons stated as follows: (1) Mr. Padgett was not a covered person under the Policy, as he was neither an active full-time employee nor was he eligible for retiree health benefits under the Plan; (2) Option D coverage extended beyond COBRA's "federally mandated maximum of thirty-six months," and therefore, the claim was excludable as not offered in accordance with COBRA regulations; and (3) Bekaert never provided the Separation Agreement and the benefits under Option D to TRU or Standard, nor were they referenced in either the Plan or the Policy. (Doc. 57-21, at 2-3.) Bekaert does not deny that it did not provide Standard with a copy of the Separation Agreement.

The Plan's only reference to Option D is contained in the Schedule of Benefits, Section 4, which states that, "Retired Salaried Employees who accepted the Rome Plant's July 27 to September 10, 1998 Enhanced Retirement Health Option "D" are not eligible for Retiree Health Benefits." (Doc. 48-2, at 17, 20). However, Mr. Padgett was included on a list of eligible COBRA continuees in Bekaert's Application for excess loss coverage. Further, as part of its Disclosure Statement, Bekaert had identified another COBRA continuee as a potential claimant that had been receiving benefits under the Plan in excess of 51 months at that time. Standard did not object or question the inclusion of these participants as COBRA continuees.

While Mr. Padgett's claim was pending, Bekaert sought to amend the Plan in order to clarify the eligibility of Option D continuees and to ensure that future claims submitted to Standard were paid promptly. Bekaert maintains that it did not seek this change to

5

retroactively provide coverage for Mr. Padgett, but rather to make it clear that he and the other Option D participants were covered persons under the Plan. Ultimately, Standard rejected the proposed amendment.

On November 5, 2009, Bekaert filed suit against Standard, alleging that Standard's denial of the Padgett claim was a breach of the parties' stop-loss agreement and seeking damages and a declaration that Standard is obligated to pay the claim because the Policy covers Mr. Padgett.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure, addressing Summary Judgment, provides in relevant part as follows:

> (a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> [ ... ]
>
> (c) Procedures.
>
> (1) *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the

absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.,* 909 F.2d 941, 943–44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989) (*citing Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus,* 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

7

### III.    ANALYSIS

In its motion for summary judgment, plaintiff Bekaert argues that the parties' stop-loss insurance agreement comprised of the Application, the Disclosure Statement, the Policy and the Plan support coverage of the Padgett claim. Further, plaintiff contends that the Policy does not clearly, specifically, and unambiguously exclude coverage for the Padgett claim, and that Mr. Padgett's COBRA continuee benefits were "offered according to COBRA regulations." Plaintiff contends that the Plan, which is incorporated into the stop-loss agreement, provides Bekaert, as the plan administrator, with sole discretionary authority to determine whether a particular claim is covered by the terms of the Plan. Bekaert asserts that the determinative issue is thus, whether it, as plan administrator, reasonably exercised its discretion in determining that Mr. Padgett was a covered COBRA continuee under the Plan. Plaintiff asserts Bekaert's determination to pay the Padgett claim was reasonable and was not an abuse of its discretion, and that the claim is not excluded under the Policy. Accordingly, plaintiff argues that Standard's excess loss coverage liability extends to the Padgett claim.

In its motion for summary judgment, defendant Standard argues that the Padgett claim for benefits exceeded the express and unambiguous time limit on continuation of coverage under the Plan. Further, Standard asserts that even if Bekaert properly paid the claim under the Plan, the claim for benefits is subject to an express exclusion under the Policy, which excludes the benefits offered to Mr. Padgett and other COBRA continuees that extend beyond the length of continuation coverage mandated under COBRA. Accordingly, Standard argues Bekaert is not entitled to reimbursement of the Padgett claim under the excess loss coverage agreement.

The role of the court in contract interpretation is to give effect to the parties' intent, *City of St. Marys v. Auglaize Cnty. Bd. of Comm'rs,* 115 Ohio St.3d 387, 390, 875 N.E.2d

561 (2007), which is presumed to lie within the four corners of the agreement. *Kelly v. Med. Life Ins. Co.,* 31 Ohio St. 3d 130, 132, 509 N.E.2d 411 (1987) (citing *Skivolocki v. E. Ohio Gas Co.,* 38 Ohio St. 2d 244, ¶ 1, 313 N.E.2d 374 of syllabus (1974)). Analysis of a claimed breach of an insurance contract is governed by familiar principles.

> An insurance policy is a contract whose interpretation is a matter of law. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. Contract terms are to be given their plain and ordinary meaning. *Gomolka v. State Auto. Mut. Ins. Co.* (1982), 70 Ohio St.2d 166, 167-168, 24 O.O.3d 274, 436 N.E.2d 1347. If provisions are susceptible of more than one interpretation, they 'will be construed strictly against the insurer and liberally in favor of the insured.' *King v. Nationwide Ins. Co.* (1988), 35 Ohio St.3d 208, 519 N.E.2d 1380, syllabus. [ ... ]" *Sharonville v. Am. Emps. Ins. Co.,* 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, ¶ 6.
>
> Although ambiguous provisions in an insurance policy must be construed strictly against the insurer and liberally in favor of the insured, *see, e.g., King v. Nationwide Ins. Co.,* 35 Ohio St.3d 208, 519 N.E.2d 1380, syllabus, it is equally well settled that a court cannot create ambiguity in a contract where there is none. *See, e.g., Hacker v. Dickman* (1996), 75 Ohio St.3d 118, 119, 661 N.E.2d 1005. Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation. *Id.* at 119-120, 661 N.E.2d 1005.

*Lager v. Miller-Gonzalez,* 120 Ohio St.3d 47, 49-50, 896 N.E.2d 666 (2008).

To resolve Bekaert's claim, the Court must look to the terms of the insurance contract, which is comprised of the Application, the Disclosure Statement, and the Policy. To establish its claim for stop loss coverage, the Policy requires that Bekaert demonstrate that Mr. Padgett is an "individual [] eligible for coverage, and covered under the Plan." (Doc. 21-1, at 6.) According to the Plan, which is incorporated into the parties' insurance contract, Bekaert is solely responsible for interpreting the Plan and determining Mr. Padgett's eligibility for benefits. The inquiry does not end there however; Bekaert must also demonstrate that none of the Policy's exclusions operate to exclude the Padgett claim from coverage under the stop loss insurance contract. Accordingly, the relevant issue is whether Padgett was eligible for coverage under the

9

Plan and not otherwise excluded by the Policy, and consequently, whether Standard was obligated to pay Bekaert for Padgett's medical expenses under the Policy.

### A.  The Plan

Bekaert urges that Padgett was a covered person under the Plan by virtue of his participation in Option D coverage, which he elected as part of the Separation Agreement offered to the Rome plant salaried employees. Bekaert argues that the reference to Option D participants in the Plan, which indicates that Option D participants are not entitled to retiree benefits, by implication, indicates that these persons fall within another participant classification under the Plan. Specifically, Bekaert asserts that Padgett and other Option D participants are covered by the Plan as COBRA continuees. Further, Bekaert argues that the COBRA time limits contained in Section 6.11.6 of the Plan do not apply to Option D participants because those persons did not experience a "qualifying event" that would trigger these limits; specifically, they were not "terminated" or fired, rather they voluntarily severed their employment. Bekaert alleges that if there is any confusion as to these Plan provisions, then Bekaert as the plan administrator has the sole discretion to resolve and interpret these provisions, and Standard, the excess loss insurer, is bound by that interpretation absent an abuse of discretion.

In this regard, Bekaert insists that this Court should apply the test adopted by the Tenth Circuit in *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281 (10th Cir. 2005). In *Zurich*, an excess loss insurer sued an employer for breach of contract, seeking return of money the insurer paid to cover outstanding medical expenses of an employee on the basis that employee was not a qualified participant under the terms of the employer's benefits plan. *Id.* The case hinged on the employer's interpretation of a break-in service limitation on participation, which provided that coverage would end 21 days after an employee was laid-off or terminated at the

10

"end of an employer project." *Id*. at 1287. The claim at issue was paid on behalf of an employee assigned to a project that had been suspended. *Id.* The employer, as plan administrator, determined that the coverage limitation was not triggered by a suspension of a project because the project had not ended and was expected to resume. *Id*. at 1287-88. The excess loss insurer insisted that the interpretation acted as an amendment in contravention of the excess loss policy, which required the insurer's written consent to any amendment before liability would attach. *Id.* at 1288.

The court in *Zurich* found that three factors weighed in favor of the employer's interpretation of the plan: (1) the employer's interpretation was reasonable in light of the plan language; (2) the plan granted the employer the sole power to interpret the meaning of the plan's terms and to make eligibility determinations; and (3) the Oklahoma contract rule of construction against the insurer required the court to prefer the employer's interpretation over the insurer's. *Id.* Importantly, the court found that the employer's interpretation of any ambiguity did not rewrite or modify the plan's language, and thus, the insurer's prior written consent was not required. *Id.*

Bekaert argues that the same result should obtain in this case. It argues that the second and third *Zurich* factors weigh strongly in its favor. It acted as plan administrator when it determined that Mr. Padgett was eligible for COBRA continuee benefits. Further, Ohio law, like Oklahoma law, interprets insurance contracts in favor of the policyholder and against the insurer.

As to the first factor, Bekaert asserts that its interpretation of the Plan was reasonable because it had previously extended continuation benefits to Option D participants ten years earlier; the Plan indicated that Bekaert intended to comply with COBRA's requirement that the Plan offer participants the right to continue coverage; the COBRA time limits contained in

11

the Plan are not applicable to Option D participants; Mr. Padgett paid all of his required COBRA premiums; and Standard raised no objection to the inclusion of long-term COBRA coverage under the Plan as revealed by Bekaert's Disclosure Statement.

Standard argues in opposition that Bekaert's interpretation is inconsistent with the terms of the Plan or any reasonable interpretation and is not supported by substantial evidence. *Computer Aided Design Sys., Inc. v. Safeco Life Ins. Co.*, 235 F. Supp. 2d 1052, 1061 (S.D. Iowa 2002) (holding there must be substantial evidence that an employer's coverage determination is reasonable before it can bind an excess loss insurer). Further, Standard contends that Bekaert's "interpretation" of the Plan is nothing more than an attempt to "amend" the Plan to avoid the Policy's prohibition of amendments without prior agreement and to avoid application of the Plan's express time limitations on continuation of coverage. The Court finds Standard's arguments well taken.

Bekaert suggests that Option D participants must have been entitled to COBRA continuation benefits because they are expressly excluded from receiving the Plan's retiree benefits. Even if this were the case, however, an interpretation that extends such coverage beyond the express COBRA time limits in the Plan is unreasonable. "In construing a written instrument, effect should be given to all of its words if this can be done by any reasonable interpretation." *Mapletown Foods, Inc. v. Motorists Mut. Ins. Co.*, 104 Ohio App. 3d 345, 346, 662 N.E.2d 48, 49 (Ct. App. 1995). The Plan must be read as a whole, and the intent of each part must be gathered from a consideration of the whole. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St. 3d 353, 359-60, 678 N.E.2d 519, 525–26 (1997). A reading of the Plan that includes extended continuation coverage would require the

12

Court to disregard the clear and unambiguous time restrictions on COBRA benefits contained in the Plan.

Section 6.11.1 indicates that the Plan intends to comply with COBRA, which requires that the Plan offer covered persons the right to continue their coverage "following certain qualifying events as described below." The next section, Section 6.11.2 then defines "qualifying events" to include an employee's "termination of employment (except for gross misconduct)." Section 6.11.6 of the Plan clearly limits the length of continuation coverage to "the earliest date of the following events: (a) 18 months after the date of the employee's termination of employment or reduction in hours […]; (b) 36 months after any qualifying event other than termination of employment or reduction in hours, even in the event of multiple qualifying events." Nothing in the Plan expressly permits Bekaert to extend continuation coverage beyond the time periods set forth in the Plan.

Bekaert urges that Mr. Padgett did not experience a "qualifying event" because he was not "terminated" or "fired," and consequently, the time limits contained in Section 6.11.6 are inapplicable to his COBRA coverage. However, if Mr. Padgett's voluntary separation was not a "qualifying event," then he was not eligible for continuation coverage under Section 6.11.1, which requires the occurrence of a qualifying event to trigger benefits. Moreover, Bekaert's narrow interpretation of the term "termination" as meaning only involuntary separation is unreasonable and not consistent with the Plan's intent to comply with COBRA. COBRA is triggered by not only involuntary separation, such as being fired, but also by voluntary separation, including retirement and/or resignation. *Youngstown Aluminum Prods., Inc. v. Mid-W. Ben. Servs., Inc.*, 91 F.3d 22, 26 (6th Cir. 1996) ("COBRA is triggered by a qualifying event. One such event is retirement.") (citing 29 U.S.C. § 1163(2)); *Branch v. G. Bernd Co.*, 955 F.2d

13

1574, 1577 (11th Cir. 1992) (holding resignation was a qualifying event under COBRA) (citing 29 U.S.C. § 1163(2)). Under the clear and unambiguous terms of the Plan, Mr. Padgett had to experience some sort of "qualifying event" to continue his coverage under Section 6.11.1. Here, that event was the "termination" or "end" of his employment by virtue of his voluntary separation. Consequently, the Plan is clear that his COBRA coverage could not extend beyond 18 months (or at most 36 months in the case of any other "qualifying event").

Further, Bekaert cannot "interpret" the Plan language to include any undisclosed agreement with Mr. Padgett and the other Option D retirees to extend their COBRA benefits beyond the time limits contained in the Plan. "Where the written instrument is unambiguous, a court must give effect to the parties' expressed intentions; unexpressed intentions are deemed to have no existence." *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 55, 716 N.E.2d 1201, 1208 (Ct. App. 1998) (citing *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 46 Ohio St. 3d 51, 53, 544 N.E.2d 920, 922-923 (1989)). "Parol evidence is admissible only if the terms of the contract are ambiguous and then only to interpret, but not to contradict, the express language." *Grange Life Ins. Co. v. Bics*, No. 01CA007807, 2001 WL 1044081, *2 (Ohio Ct. App. Sept. 12, 2001) (citing *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 15 Ohio St. 3d 321, 324, 474 N.E.2d 271 (1984)). The Court "cannot enlarge the coverage by implying terms that are not in the agreement." *Cincinnati Ins. Co. v. Kramer*, 91 Ohio App. 3d 528, 531, 632 N.E.2d 1333, 1334 (1993).

The Plan states that it intends to comply with COBRA and then expressly adopts, as a maximum, the length of continuation coverage that COBRA requires. Bekaert is correct that COBRA does not prohibit it from offering longer coverage than it is statutorily required to offer,[2]

---

[2] *Youngstown Aluminum Prods., Inc,*, 91 F.3d at 26 ("COBRA sets minimum periods of continuation coverage, and if a health insurance provider chooses to offer more favorable coverage to plan participants, it may so provide in the

however this alone does not establish that this Plan *actually* provided such extended coverage. Bekaert's unexpressed and undisclosed intention to extend COBRA benefits for more than 18, or even 36 months, to Option D retirees does not bind Standard. Bekaert's interpretation is not consistent with the Plan absent a revision or modification of the Plan terms to include the extended coverage. Such an amendment is clearly prohibited by the Policy unless approved by Standard in advance.

While Bekaert may have had every intention of extending continuation coverage to Option D retirees beyond that which COBRA requires, the language of the Plan fails to do this. Bekaert's decision to pay Mr. Padgett's claims for benefits was required by the Separation Agreement it had with Mr. Padgett, but not by the terms of the Plan. The Separation Agreement is not part of the stop-loss agreement at issue here. Consequently, Standard is not bound to reimburse Bekaert for the Padgett claim paid according to the Separation Agreement.

### B.  The Application and Disclosure Statement

Bekaert also cannot rely on its Application for insurance, which listed Mr. Padgett as a COBRA continuee, or the Disclosure Statement, which listed another employee receiving extended COBRA benefits, to bind Standard. The Disclosure Statement indicates that it is an "integral part of the application for excess loss coverage," and that Standard and TRU "use the information requested […] solely for the purpose of evaluating the acceptability of this risk […]." (Doc. 54-4, at 2.) The Application for insurance provides that any coverage resulting from the application "shall be as described in and shall be subject to the terms and provisions of the Policy." (Doc. 54-2, at 3.) The Policy only requires Standard to reimburse Bekaert for eligible

---

documents that set forth the terms of the plan."); *Fallo v. Piccadilly Cafeterias, Inc.*, 141 F.3d 580, 583 (5th Cir. 1998) ("Of course these rules are the minimum requirement. An employer may provide greater continuation benefits for its employees under their health insurance plans.").

expenses incurred by persons covered under the Plan. As outlined above, Mr. Padgett was no longer covered by the Plan because his continuation benefits exceeded the clear and unambiguous time limits on COBRA benefits contained in the Plan. Nothing in the parties' agreement for stop-loss coverage requires Standard to pay a claim solely because that person was listed in the Application. Likewise, no language in the Disclosure Statement indicates that Standard is bound to pay every claim that is listed therein.

Nor does Standard's acceptance of premium payments constitute a waiver of its right to challenge excess loss claims filed by Bekaert that are based on benefits paid to Plan participants disclosed in the Application and the Disclosure Statement.  As a general rule, under Ohio law, the coverage of an insurance policy cannot be expanded by estoppel and waiver. *Erie Ins. Co. v. Favor*, 129 Ohio App. 3d 644, 649 718 N.E.2d 968, 972 (Ct. App. 1998); *Motorists Mut. Ins. Co. v. Trainor*, 33 Ohio St. 2d 41, 62, 294 N.E.2d 874 (1973) (paragraph one of the syllabus). "This rule has been applied when coverage is expressly excluded under the terms of the policy […]. A company should not be obligated to cover a risk for which it did not contract." *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St. 3d 657, 668, 597 N.E.2d 1096, 1104 (1992). In this case, Standard never promised to pay for any expenses incurred by a person not covered under the Plan.

> For [Bekaert] to recover [it] would be required to prove, not that [Standard] waived some available defense, but rather that there somehow be read into this policy a promise to pay that has never been written therein. This would in no sense be a waiver but would be the making of a new contract.

*Smith v. Aetna Life Ins. Co.*, 58 Ohio App. 412, 414, 16 N.E.2d 608, 608-09 (Ct. App. 1937).

As outlined in Standard's brief in opposition to Bekaert's motion for summary judgment, the cases on which Bekaert relies do not hold otherwise and are factually inapposite because they apply estoppel and waiver to avoid a forfeiture of coverage, which is not at issue

16

here. (Doc. 64, 13-14.) As discussed above, Bekaert's Plan does not provide for extended COBRA benefits. Further, Bekaert did not disclose within the Application that Mr. Padgett had been receiving COBRA benefits for more than 10 years, nor was Standard aware of the Separation Agreement between Bekaert and Mr. Padgett.[3] *Cf. Monteith v. Cmty. Mutual Blue Cross/Blue Shield*, No. 93APE09-1215, 1994 WL 183642, *8 (Ohio Ct. App. May 10, 1994) (holding insurer had waived its right to cancel a policy by continuing to accept premiums for sixteen months after learning of the insured's allegedly fraudulent conduct); *Cmty. Life Ins. Co. v. RIS Admins., Inc.*, 61 Ohio App. 3d 742, 745-46, 573 N.E.2d 1141, 1144 (1989) (holding that insurer waived right to withdraw life coverage after accepting premium and issuing policy to insured who was clearly ineligible for coverage under the policy due to his disclosed age); *Van Dyne v. Fidelity-Phenix Ins. Co.*, 17 Ohio App. 2d 116, 126-27, 244 N.E.2d 752, 760-61 (1969) (holding insurer liable for agent's endorsement of policy change after collecting two more premium payments following agent's representation to insured). As there has been no forfeiture or reduction of coverage otherwise contracted for under the Plan, Standard's acceptance of Bekaert's premiums cannot bind it to pay for claims not otherwise covered. *Hybud Equip. Corp.*, 64 Ohio St. at 668, 597 N.E.2d at 1104.

## C. The Policy Exclusion

Even if the Court were to find that the Padgett claim was properly paid under the terms of the Plan or otherwise incorporated into the stop-loss agreement by the Application or the Disclosure Statement, the Policy unambiguously excludes coverage of the Padgett claim. The Policy excludes from coverage charges "for any COBRA continuee or retiree whose continuation of coverage was not offered […] according to COBRA regulations." Bekaert argues that so long

---

[3] In fact, the Application identifies Mr. Padgett as a COBRA continuee since January 1, 2008.

as its offer of extended COBRA coverage did not violate COBRA, it is "according to" COBRA. However, an act that does not clearly violate a statute is not necessarily "according to" it.

The phrase "according to" means "in conformity with," "as stated or attested by," or "depending on." *City of Pataskala v. Fraternal Order of Police*, Nos. 99AP-81, 99AP-84, 2000 WL 192583, *3 (Ohio Ct. App. Sept. 28, 1999) (citing MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10ed. 1994) 8). Thus, in this context, the phrase "according to COBRA regulations" reasonably means that continuation benefits must be offered only in reference to (i.e., in conformity with or depending on) the COBRA regulations. In other words, the COBRA regulations must be the only source from which the coverage determination is made. *See, id.* (holding that phrase "according to the most recent federal decennial census" reasonably meant that a population determination must be made only in reference to the most recent federal decennial census). In this case, Bekaert admits that its coverage determination as to the Padgett claim was not made dependent on the time periods required by COBRA law, but pursuant to or in conformity with its separate written agreement with Mr. Padgett. This extended continuation coverage was thus not offered "according to COBRA regulations," and is thus excluded from coverage under the Policy. Accordingly, Standard is not liable to Bekaert under the stop loss agreement for the Padgett claim or for any other claim for benefits premised on continuation coverage extending beyond the COBRA law time periods expressly adopted by the Plan.

18

**IV.      CONCLUSION**

For the foregoing reasons, Standard's Motion for Summary Judgment is **GRANTED**, and Bekaert's Motion for Summary Judgment is **DENIED**. This action is **DISMISSED** in its entirety.

**IT IS SO ORDERED**.

Dated: August 15, 2011

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**